# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### MONROE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NUMBER  13-0274 |
| VERSUS | * | JUDGE ROBERT G. JAMES |
| EDWARD A. JORDAN a/k/a ANTHONY E. JORDAN | * | MAG. JUDGE KAREN L. HAYES |

### REPORT AND RECOMMENDATION

Before the undersigned Magistrate Judge, on reference from the District Court, is a motion to suppress [doc. # 21] filed by defendant, Edward A. Jordan.  For reasons stated below, it is recommended that the motion be **DENIED**.

### Background

On May 20, 2013, the Special Crimes Apprehension Team ("SCAT"), a unit of the Ouachita Parish Sheriff, decided to investigate several Crime Stopper tips that it had received indicating that Edward Jordan was selling pills and other illegal substances from a residence at 109 Dellwood Drive, Monroe, Louisiana.  Once at the residence, the deputies detected an odor of raw marijuana near the front door.  When no one answered the door, they proceeded through the carport and encountered Edward Jordan in the backyard.  The deputies advised Jordan of his *Miranda* rights and questioned him concerning the marijuana odor.  Jordan denied the deputies' ensuing request to search the residence.  Accordingly, one of the deputies retreated to his vehicle, and electronically applied for, and obtained a search warrant.  The ensuing search of the residence uncovered, *inter alia*, marijuana, firearms, and ammunition.  Jordan also made various statements to the deputies during the encounter.

On October 23, 2013, a federal grand jury returned a three count indictment against Edward A. Jordan charging him with knowingly possessing firearms and ammunition (a Hi-Point model 995; 9 mm carbine, serial number B79630, and ammunition) after having previously been convicted of a felony (Count 1), knowingly possessing and intending to distribute marijuana (Count 2), and possessing a firearm in furtherance of possessing and intending to distribute marijuana (Count 3). *See* 18 U.S.C. §§ 922(g)(1), 924(a) & (c)(1), and 21 U.S.C. §§ 841(a)(1). The Government also seeks forfeiture of the ammunition referenced in Count 1.

On December 24, 2013, Jordan, via counsel, filed the instant motion to suppress all evidence seized and any statements made by him stemming from the purportedly unlawful search of his house. Following a delay for a February 18, 2014, evidentiary hearing, transcription of the hearing testimony, and submission of post-hearing briefs, the matter is now before the court.

**Evidence and Testimony**

## I.    Hearing Testimony

The following facts were established via testimony presented at the February 18, 2014, hearing held in this matter. Four Ouachita Parish Sheriff's deputies testified at the hearing: Cody Custer, Timothy Klick, Justin Cromwell, and Matthew Hill.

a)    Cody Custer

Corporal Cody Custer is a six year veteran with the Ouachita Parish Sheriff's Office. (Tr. 4). He is a patrol officer who, for the past five years, has been assigned to SCAT. (Tr. 4-5).

At approximately 5:00 p.m. on May 20, 2013, Custer received an e-mail from his supervisors that referenced several Crime Stopper tips. *See* Tr. 5-7. The e-mail stated that at different times, the sheriff's office had received several different crime stopper tips against Edward Jordan. *Id*. The e-mail included a description of the residence at 109 Dellwood,

provided the suspect's name, and specified the type of activity he was involved in.  *Id*.  Custer

was aware of at least two tips indicating that Jordan was suspected of selling pills and other

illegal substances.  *Id*.

Upon receipt of the e-mail, Custer decided to mobilize SCAT and proceed to Jordan's

residence.  (Tr. 5, 7).  He took with him all of the SCAT members who were on duty at the time

(up to ten members).  (Tr. 8).  When he arrived at the residence, Custer advised headquarters that

he was on scene.  (Tr. 9). Approximately six to seven deputies exited their units.  *Id*.

Custer knocked on the door first, but after receiving no answer, he proceeded to the rear

of the residence where he encountered Jordan.  (Tr. 9-10).  Custer identified himself to Jordan

and told him the reason that he was at his residence.  *Id*.  Jordan replied, "I don't know what y'all

are talking about."  (Tr. 10).  Custer then advised Jordan of his *Miranda* rights because he, and

other deputies, had detected an odor of raw marijuana while standing at the front door.  *Id*.

After advising Jordan of his *Miranda* rights, Custer told Jordan that he had detected raw

marijuana at the front door.  (Tr. 11).  Jordan denied any knowledge of same.  *Id*.  He explained

that somebody had been smoking marijuana on his front porch earlier in the day.  *Id*.

Custer then escorted Jordan around to the front of the house, and explained to him that he

would have to secure a search warrant for the residence if Jordan would not allow him inside.

(Tr.  11).  Jordan denied permission.  *Id*.  Therefore, Custer proceeded to secure a search warrant.

*Id*.

Custer retreated to one of the police vehicles equipped with a laptop computer and the

Vsigner program.  (Tr. 12).  Custer submitted the first search warrant application several minutes

before 5:34 p.m.  (Tr. 12-14).  Once Custer completed the warrant application on the computer,

he electronically transmitted the application to the duty judge, who reviewed it, and electronically

approved the warrant and returned it to Custer.  *Id*.  The completed warrant was returned at 5:34 p.m. *Id*.

While Custer applied for the warrant, the other officers secured the residence, with Jordan sitting in front of the residence.  *Id*.  At that time, the deputies did not know whether there was anyone else inside of the residence.  *Id*.  According to Custer, the other officers did *not* make a protective sweep of the house.  (Tr. 21).  Custer did not believe that the officers were under any threat while outside the house.  *Id*.  As a result, he did not feel that a protective sweep was necessary.  (Tr. 21-22).

After Custer received the signed warrant, he realized that it applied only to the residence. (Tr. 14).  However, he also wanted to search the vehicles and the buildings located outside of the residence.  *Id*.  Accordingly, he applied for a second warrant while the team proceeded to search the home pursuant to the initial warrant.  *Id*.

Custer received the second warrant at 5:50 p.m.  (Tr. 14).  At that point, he joined the search team.  *Id*.  Custer does not recall whether the house was locked or not, or whether they had to retrieve the keys from Jordan's pocket.  (Tr. 15-16).  They did not find anyone inside of the house.  *Id*.  Custer recovered $1,102 and a cell phone from Jordan's front pocket.  *Id*.

The deputies also uncovered two bags of marijuana at the residence:  one small plastic bag for personal use, and another large bag, more commonly associated with illegal distribution, located in a plastic box on the kitchen counter.  (Tr. 19).  Custer did not know the size of the large bag or the quantity of marijuana found therein.  (Tr. 20).  The box with the larger bag of marijuana was on the kitchen counter with the top open.  (Tr. 21).

The search was completed at 7:40 p.m..  (Tr. 17).  The vehicles were taken to the Ouachita Parish Correctional Center.  (Tr. 18).  Nothing was located in the vehicles.  *Id*.

4

b)     Timothy Klick

Deputy Timothy Klick is a five year veteran with the Ouachita Parish Sheriff's Office's SCAT division.  (Tr. 22-23).  He has been a SCAT member for the past two years.  *Id.*

Klick said that when the deputies arrived on scene, they saw Jordan standing in his back yard, so they went back there to talk to him.  (Tr. 25).  Some of the deputies remained in the front yard.  *Id.*

Deputies Klick, Wiles, and probably Cromwell went inside the house to secure it while Custer applied for the warrant.  (Tr. 26-27).  Klick added that "[w]henever we do something like that, we've got to make sure that there's nobody inside with guns, make sure nobody is waiting to ambush us or anything like that, and we secure the location and everybody outside and just wait on the search warrant."  *Id.*  During the sweep, the officers observed some marijuana in plain view on the countertop.  (Tr. 28).  After they made sure that no one was in the house, they retired outside and waited for the search warrant.  *Id.*

Upon receipt of the search warrant, Klick returned inside and seized the marijuana, marijuana scales, and some baggies on the countertop.  (Tr. 28).[1]  The scales were large, industrial-sized electronic scales.  (Tr. 28).  The lid to the box was open and everything arranged on the lid.  *Id.*  Both the bag and the box were open.  (Tr. 29).  Klick also found another small bag of marijuana in the residence.  (Tr. 30).

c)     Justin Cromwell

Deputy Justin Cromwell has seven years of experience with the Ouachita Parish Sheriff's Office, and has been a member of the SCAT unit for approximately two years.  (Tr. 32-33).

Cromwell remained in the front of the house on the side next to the carport.  (Tr. 34).

---

[1]  Klick thinks that the front door was unlocked.  (Tr. 31).

5

Most of the time, Cromwell stood next to Jordan.  *Id*.  When the deputies arrived at the residence, Jordan was walking from the backyard.  *Id*.

Jordan was taken into custody prior to the search, i.e., detained.  (Tr. 34-35).  The deputies also conducted a protective sweep of the home before the search.  *Id*.  Cromwell explained that,

> [w]e – like we do in most cases, we just walk in, make sure there's no armed suspects inside the residence.  Once we discover that there's no people inside the house, we come right back out and secure the search warrant.  The purpose of the protective sweep simply was to ensure that there were no people inside of the home.  Once this is confirmed, they retire outside and secure the search warrant.

*Id*.

Cromwell added that he had reason to believe that there might be others in the residence based on the anonymous complaints that there were firearms in the residence and because Jordan had said that there had been people smoking marijuana there earlier that day.  (Tr. 36).

At 6:35 p.m., Cromwell seized, *inter alia*, a pack of rolling papers and a small bag of suspected marijuana.  (Tr. 36).

    d)    <u>Matthew Hill</u>

Sergeant Matthew Hill is a 12 year veteran of the Ouachita Parish Sheriff's Office.  (Tr. 38).  He has been a member of the SCAT unit since January 2007.  *Id*.

Hill stated that he smelled marijuana when he approached the house.  (Tr. 39).  Hill admitted that the deputies conducted a protective sweep of the residence.  (Tr. 40).

During the subsequent search, Hill uncovered 27 live rounds of 9 millimeter ammunition in a plastic cup.  *Id*.  He also discovered several books of checks drawn on Capital One Bank.  *Id*.

**II.    Exhibits**

At the hearing, both sides agreed that several exhibits attached to the government's

response to the motion to suppress were to be included in the record for purposes of the instant motion.  (Tr. 43).

> a)      Narrative Number 3 by Cody Custer

In his narrative report, Custer documented that according to the Crime Stopper tips, Jordan distributed marijuana and prescription pills in the Monroe area, and had large amounts of U.S. currency in bank accounts in California.  (Gov.'t Response, Exh. 1).

After Custer encountered Jordan, he advised him of his *Miranda* rights, which Jordan acknowledged, and elected to waive.  *Id*.  Jordan claimed that there were no illegal items inside of the house that he knew of.  *Id*.  In fact, Jordan initially claimed that his father owned the residence, and that he was just visiting.  *Id*.  Jordan explained that the marijuana stemmed from two unknown females who were smoking it in a motor home parked outside of the residence.  *Id*.

Jordan eventually acknowledged that the residence belonged to him.  *Id*.  Other than the Ford pickup, Jordan disclaimed any interest in the remaining vehicles at the residence. *Id*.

Jordan also explained that, earlier that day, he had found the 9mm carbine in his yard.  *Id*.  He brought the gun inside, and intended to sell it.  *Id*.  Jordan later admitted that the suspected marijuana in the house belonged to him and that he had purchased it for $1,200.  *Id*.  He denied selling narcotics for profit.  *Id*.

> b)      Search Warrant and Application

In his application for a search warrant, Custer noted that SCAT had received several detailed crime stopper tips stating that Edward Jordan was engaged in suspected narcotic sales and trafficking at 109 Dellwood Drive.  (Gov.'t Response, Exh. 2).  Custer further explained that the deputies had detected an overwhelming odor commonly associated with suspected raw marijuana, emanating from the carport of the residence.  *Id*.  The odor grew stronger as the

deputies approached the front door.  *Id*.  The application was dated May 20, 2013, at 17:34:32. *Id*.

The Honorable Alvin Sharp of the 4th Judicial District Court for the Parish of Ouachita, State of Louisiana, signed the search warrant, dated May 20, 2013, at 17:34.32.  *Id.*

### Law and Analysis

Defendant initially argued that the deputies violated his Fourth Amendment rights when they searched his residence approximately one and one-half hours *before* they obtained a search warrant.  In his post-hearing brief, defendant modified his argument to contend that the warrant was tainted by the prior, protective sweep that was not supported by a reasonable, articulable suspicion of danger.

The defendant normally bears the burden of proving by a preponderance of the evidence that the challenged search or seizure was unconstitutional.  *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005) (citation omitted).   However, when law enforcement officers act without a warrant, the government bears the burden of proving that the search was valid.  *Id.*; *see* discussion, *infra*.

**I.  The Deputies' Initial Sweep of the Home is Supported by Exigent Circumstances**

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  Under the Fourth and Fourteenth Amendments a search conducted without a warrant supported by probable cause is presumptively unreasonable, subject to but a few well-delineated exceptions.  *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S. Ct. 2041, 2043-44 (1973).  A warrantless entry will survive constitutional challenge if "exigent circumstances" support the intrusion.  *United States v. Rico*, 51 F.3d 495, 501 (5th Cir. 1995) (citations omitted).  Exigent

circumstances "include those in which officers reasonably fear for their safety, where firearms are present, or where there is a risk of a criminal suspect's escaping or fear of destruction of evidence." *Id*.

The court further observes that "[a] protective sweep is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others.  It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Maryland v. Buie*, 494 U.S. 325, 327, 110 S. Ct. 1093, 1094 (1990) (internal quotation marks omitted).  Furthermore, the Fourth Amendment permits a protective sweep if the searching officer "possesse[d] a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant[ed] the officer in believing, that the area swept harbored an individual posing a danger to the officer or others." *Id*. (citations and internal quotation marks omitted).

The following factors are relevant to determine whether exigent circumstances exist,

(1)    the degree of urgency involved and amount of time necessary to obtain a warrant;

(2)    [the] reasonable belief that contraband is about to be removed;

(3)    the possibility of danger to the police officers guarding the site of contraband while a search warrant is sought;

(4)    information indicating the possessors of the contraband are aware that the police are on their trail; and

(5)    the ready destructibility of the contraband and the knowledge "that efforts to dispose of narcotics and to escape are characteristic behavior of persons engaged in the narcotics traffic.

*Rico, supra*.

Nonetheless, there is no set formula for determining when exigent circumstances justify a warrantless entry. *United States v. Maldonado*, 472 F.3d 388, 393 (5th Cir. 2006) (citation

omitted), *abrogated on other grounds by Kentucky v. King*, ____ U.S. ____, 131 S.Ct. 1849 (2011).

In evaluating exigency, the court "should consider the appearance of the scene of the search in the circumstances presented as it would appear to reasonable and prudent men standing in the shoes of the officers." *United States v. Rodea*, 102 F.3d 1401, 1405 (5th Cir. 1996) (citation omitted). If reasonable minds differ, "the courts should not second-guess the judgment of experienced law enforcement officers concerning the risks of a particular situation." *United States v. Blount*, 123 F.3d 831, 838 (5th Cir. 1997) (citation omitted).

Applying the foregoing consideration here, the court finds that exigent circumstances support the deputies' protective sweep of the home. Quite understandably, defendant stresses Deputy Custer's statement that he did not feel that a protective sweep was necessary because, in his opinion, the officers were safe where they were outside of the home. Clearly, however, the officers who conducted the protective sweep were of a different opinion. Deputy Cromwell testified that, per the anonymous complainants, the house contained firearms. In addition, Jordan had told the deputies that other individuals had been smoking marijuana on the premises earlier that day. In other words, there was evidence that someone else could be inside the house with access to firearms and/or the narcotics.

In *Rico*, the Fifth Circuit approvingly noted that if officers are standing around in the front yard arresting people in the driveway, they need to ensure that there is no one else on the premises who could assist the arrestee or destroy evidence. *Rico, supra*. Furthermore, the officers need not have a particularized fear that weapons are present or that someone else is on the premises. *United States v. Howard*, 106 F.3d 70, 75 (5th Cir. 1997) (citation omitted). Rather, fear for officer safety is reasonable in drug cases because of the common use of firearms

in the drug trade.  *See Howard, supra* (citation omitted).

In any event, the same result obtains even if exigent circumstances were not present, and the deputies effectively seized the contents of defendant's house when they secured the premises from within in order to preserve the status quo.  The Supreme Court has recognized that there is no Fourth Amendment violation under the foregoing circumstances, when, as here, officers have probable to cause to enter the premises, and have probable cause to take into custody those persons who hold a possessory interest in the contents of the home, during such time as another officer is endeavoring, in good faith, to obtain a warrant.  *See Segura v. United States*, 468 U.S. 796, 798, 104 S. Ct. 3380, 3382 (1984).  Evidence discovered during a subsequent search of the premises *after* the officers obtain a valid search warrant issued wholly on information known to the officers *before* the entry into the home does not require suppression as "fruit" of the illegal entry because the warrant and the information on which it was based are unrelated to the entry and therefore constitutes an independent source for the evidence.  *Segura, supra*.

The foregoing rationale applies here.  Deputy Custer did not use any information from the protective sweep to support his search warrant application.  In fact, Custer was not even aware that the other officers had conducted a protective sweep.[2]  Moreover, defendant does not contest that the warrant was supported by probable cause, or alternatively, that the officers did not have a good faith basis to rely on the warrant.

In sum, the court discerns no Fourth Amendment violation.

---

[2]  Custer's statement that he did not believe a protective sweep was necessary undermines defendant's suggestion that SNAP had a policy or custom of always conducting protective sweeps regardless of any reasonable articulable basis to support the intrusion.

## II.     The Fourth and Fifth (via the Fourteenth) Amendments do not Bar the Admission of Defendant's Incriminating Statements at Trial

The admissibility of pre-indictment confessions is regulated by both the Fifth Amendment Privilege against Compelled Self-incrimination ("Fifth Amendment") and the Due Process Clause of the Fifth and/or Fourteenth Amendments ("Due Process Clause"). The Fifth Amendment provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself . . ." U.S. Const. amend. V. In *Miranda v. Arizona*, the Supreme Court held that

> the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of [a] defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. As for the procedural safeguards to be employed, unless other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.

*Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612 (1966) (footnote omitted).

The central principle established by *Miranda* is that if the police question an in-custody suspect without informing him of the rights specified therein, then his responses cannot be introduced into evidence to establish his guilt. *Berkemer v. McCarty*, 468 U.S. 420, 429, 104 S.Ct. 3138, 3144 (1984). "[F]ailure to give the prescribed warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained. Conversely, giving the warnings and getting waiver has generally produced a virtual ticket of admissibility . . ." *Missouri v. Seibert*, 542 U.S. 600, 609, 124 S.Ct. 2601, 2608 (2004) (footnote omitted).

In addition, a criminal defendant is "deprived of due process of law if his conviction is

12

founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession and even though there is ample evidence aside from the confession to support the conviction." *Lego v. Twomey*,  404 U.S. 477, 483-484, 92 S.Ct. 619, 623- 624 (1972) (citations and internal quotation marks omitted).  The defendant is entitled to "object to the use of the confession and to have a fair hearing and a reliable determination on the issue of voluntariness, a determination uninfluenced by the truth or falsity of the confession." *Id*.  The sole purpose of the hearing is to determine whether the confession was coerced.  *Id*.

The government must establish by a preponderance of the evidence the voluntariness of an incriminating statement and the *Miranda* waiver.  *Colorado v. Connelly*, 479 U.S. 157, 169, 107 S.Ct. 515 (1986); *Lego, supra; United States v. Mullin*, 178 F.3d 334, 341 (5th Cir. 1999). The voluntariness of a waiver contemplates two distinct dimensions:

> [f]irst, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

*United States v. Guanespen-Portillo*, 514 F.3d 393, 403 (5th Cir. 2008) (citation omitted). Nevertheless, in *Connelly*, the Supreme Court clarified that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment."  *Connelly, supra*.  Equally, "[t]he sole concern of the Fifth Amendment, on which *Miranda* was based, is governmental coercion."  *Id*. Thus, the voluntariness of a *Miranda* waiver and resulting confession depend upon the absence of police overreaching, not on "free choice."  *Id*.

The Fifth Circuit remarked that after *Connelly*, the relevant test no longer focuses on the defendant's free will.  *United States v. Raymer*,  876 F.2d 383, 386 -387 (5th Cir. 1989) (citations

omitted).  "Instead, the focus is on the presence or absence of police coercion."  *Id*.  Although a defendant's mental condition still figures into the voluntariness calculus, there must be an element of official overreaching to render a confession involuntary under the Constitution.  *Id*.  In other words, the police must exploit the defendant's mental condition.  *See Raymer, supra*.

Applying the foregoing considerations here, the undersigned reiterates that there was no antecedent Fourth Amendment violation.  *See* discussion, *supra*.  Furthermore, Deputy Custer advised Jordan of his *Miranda* rights shortly after he initiated contact, and before he obtained any potentially incriminating statements from him.[3]  The record is devoid of any allegations or evidence of coercive police tactics.  Moreover, there are no issues regarding Jordan's mental competence or lucidity at the time that he made the incriminating statements.

In the absence of police "overreaching" or coercion and upon consideration of the circumstances, the undersigned finds that the government has demonstrated by a preponderance of the evidence the voluntariness of Jordan's incriminating statement(s) and *Miranda* waiver.

### Conclusion

For the above-stated reasons,

IT IS RECOMMENDED that the motion to suppress [doc. # 21] filed by defendant Edward A. Jordan be DENIED.

Under the provisions of 28 U.S.C. §636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen(14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within

---

[3]  Although Deputy Custer did not specify the actual *Miranda* warnings that he provided to Jordan, defendant has not questioned the sufficiency of those warnings in his post-hearing brief.  *Compare United States v. Blevins*, Cr. No. 11-0012, 2011 WL 2910504 (W.D. La. May 31, 2011) *report and recommendation adopted,* 2011 WL 2910113 (W.D. La. July 15, 2011).

**fourteen (14) days** after being served with a copy thereof.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.  Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Monroe, Louisiana, this 7th day of April 2014.

KAREN L. HAYES
UNITED STATES MAGISTRATE JUDGE

15